FRED BUCK, Appellee, v. AMERICAN RAILWAY EXPRESS COMPANY, Appellant.

CARRIERS:   Live Stock—Presumption.   A presumption of negligence
1   on the part of a carrier follows a showing that an animal died *en*

*route* after having been delivered to the carrier in sound, healthy condition.

**CARRIERS: Live Stock—Instructions.** The court need not, in an action for loss of stock *en route*, instruct as to the effect of certain matters developed in the evidence on which plaintiff does not specifically rely for a recovery.

**EVIDENCE: Opinion Evidence—Conclusions of Witness.** Whether a crated hog had been so placed in a car as to get plenty of air may be a conclusion; but the exclusion of such a question will not be questioned when the facts are so fully developed as to enable the jury to pass upon the question.

*Appeal from Johnson District Court.*—R. G. POPHAM, Judge.

### MARCH 13, 1923.

### REHEARING DENIED MAY 18, 1923.

ON July 22, 1920, plaintiff delivered to defendant, at the town of Farson, Iowa, for shipment to Iowa City, Iowa, by express, a male hog, which, as defendant claims, died in transit. Plaintiff sues to recover the value of the animal. Trial to a jury. Verdict and judgment for plaintiff. Defendant appeals.— *Affirmed.*

*Messer, Clearman & Olsen,* for appellant.

*Dutcher, Davis & Hambrecht,* for appellee.

PRESTON, C. J.—1. The plaintiff alleges, and his evidence tends to show, that the hog was delivered to defendant suitably crated, and was in good condition. The hog was unaccompanied by anyone representing plaintiff. The hog died in transit, and while in the custody and under the control of defendant company. There is a claim by defendant that the crate was not long enough; but there was a conflict as to this, which is settled by the verdict of the jury. Defendant denies generally, and says that it was in no manner responsible for the death of the hog; that the shipment was in hot weather; and that the death of the hog was due to its own acts and conduct and its own nature and pro-

1. CARRIERS: live stock: presumption.

pensities, and was due to conditions and causes over which defendant had no control, and for which it is in no way responsible. The theory of the trial seems to have been that the question was as to whether defendant properly cared for the animal while it was in the care of the defendant company. The evidence was directed largely to that question.

The trial court instructed the jury, in substance, after first stating what would be necessary for plaintiff to show, to make a prima-facie case, that, if the jury should find by a preponderance of the evidence that the hog was in sound condition when delivered to defendant, and that it died in transit, then defendant was presumed to have been negligent, and if this was the cause of the injury, then plaintiff would be entitled to recover, unless such presumption was met by the defendant, as later instructed. Another instruction is to the effect that defendant claims that the shipment was made when it was very hot; that the death of the hog was due to its own acts and conduct and its own nature and propensities, or to conditions and causes over which defendant had no control; that defendant is not liable for the death of the hog if the same was due to any inherent vices or propensities of the animal shipped; that, if the jury should find by a preponderance of the evidence that the death of the hog was due to any inherent vices or propensities of the animal shipped, or to conditions and causes over which defendant had no control, then the verdict should be for the defendant; that, upon the whole case, plaintiff must show that defendant was at fault.

Summarizing the instructions, 4 and 5 state what is necessary to make out a prima-facie case for plaintiff; and in 6, the jury are told what defendant must show, and that, on the whole case, the burden is on the plaintiff. Plaintiff's evidence was such as to make a prima-facie case and authorize a recovery, had the case then been submitted to the jury. We shall see later that plaintiff's prima-facie case was materially strengthened by other circumstances appearing in the record, some of which will be referred to later. We think the instructions are as favorable to the defendant as it was entitled to.

The general rule is that a carrier of goods is an insurer of the safe transportation of the goods committed to it for that

purpose, and is responsible for all damages to same while in transit, unless such damage is occasioned by certain excepted causes. As to such excepted causes, it is not an insurer. We have said in prior cases that the rule is well established in this state that from proof that live stock is delivered to the carrier in good condition and is found in bad condition on arrival at its destination, a prima-facie case of negligence is made out, which the carrier must overcome, in order to relieve itself from liability. Defendant does not claim that the hog was injured by the act of God or the act of the public enemy; so that it comes back to the question of fact as to whether the death was due to the vices or propensities of the animal itself, or from natural causes, or from the fault of the shipper. These defenses were pleaded affirmatively by the defendant as an excuse for its failure to transport and deliver the hog alive and in the condition in which the company received it.

The route from Farson to Iowa City was northeast, on the Kansas City division, to Davenport, and from there west on the main line to Iowa City. The hog was dead when the train reached Davenport, where a post-mortem was held by the representatives of the defendant company, and the hog was then taken to the rendering works. The plaintiff was not present, and had no knowledge of this until afterwards. Because of the time which had elapsed after the death of the hog, and before the post-mortem, the cause of death could not be determined from the post-mortem. The hog was so badly decomposed that the post-mortem would disclose nothing. The veterinarian testifies that in his opinion the cause of the death was that the crate was not long enough. This is the claim, or one of the claims, of defendant, and that this was the fault of the shipper. As said, there was evidence to the contrary. Plaintiff's testimony is that the hog and crate were billed at 150 pounds, and that the hog would weigh about 125 pounds. The veterinary testified that, in his opinion, the hog which he saw, and upon which he held a post-mortem, would weigh 200 pounds. There is little, if any, evidence in the case tending to establish the claim that the death was due to vices of the animal. It is not as though there were a number of cattle loose in the car, one or two of which were vicious and inclined to horn each other,

or horses kicking each other, and the like. True, it is shown that there were some scratches on the hog's lips, but these were not the cause of the death. It is not so claimed. The jury could have found from the evidence that, at the time the hog was delivered to defendant and accepted by it for transportation, it was sound and in a healthy condition. The hog in question was one of 20 crates of hogs which were loaded between 4 o'clock and 5:30 in the afternoon, when the train arrived at Farson from Kansas City. There were four hogs in the train, on leaving Kansas City at 8:15 that morning. There were in the train one full express car and one half express car, the full car being 70 feet in length, and 9 feet 8 inches wide. One half of the other car was used for the mail. At Farson, 12 crates of hogs, including the one in question, were put in the full car, and the remaining 8 in the half car. There were also in the full car about two truck-loads of express and a truck-load of baggage. The baggage and express were at the rear end of the car. The doors were on either side of the express car, and there were openings at the ends. The train arrived at Davenport about 9:30 P. M., where all the express was unloaded. It appears that the hog in question was fussy *en route*, squealing, and sitting down in a sitting position. The messenger thought its foot was caught in the crate, but found it was not. The crate was moved but once in the car, and that was soon after leaving Farson. The messenger says he dropped a pan of water under the hog in the crate, but the hog did not quiet down after that. It was a hot day, or had been before the hogs were loaded. The messenger's book shows the weight and value of the hog: weight 150 pounds, value $450. He noticed that the hog was in distress soon after leaving Farson, at which time he moved the crate, as before stated. He offered the hog a drink in a wash basin which would hold about a quart, that being all the water in the car available, except a gallon for drinking purposes. The hog refused to drink the water, and the messenger threw it in the bottom of the crate. The hog acted as though it felt the heat. All that the messenger did to relieve the hog *en route* was to use the water and to move the hog once. The messenger observed the restless condition of the hog all the way. It appears that there were 20 station stops between Farson

and Davenport. It was a hot day. The car was crowded by three truck-loads of other matter, and by the other hogs. There would be additional animal heat from the other hogs. There were 16 crates of hogs in the same car, some of them larger than this one. None of the crates were placed on top of each other. There was a space of from 18 inches to 2 feet between the different crates. When loaded, the crates were placed in the car as they were to be taken out at transfer points: those to be taken out first were placed nearest the door. According to the plat used in evidence, this hog was at first placed near the center of the car, and a little to one side, but not near the door, as we understand the plat and the evidence. He was placed between a row of crates on one side of the car and two rows of crates on the other side. As said, he was moved nearer the front of the car, but still between the crates on either side. But one quart of water was used in the entire trip, though there were 20 station stops between Farson and Davenport. Whether the hog, when seen to be in distress, refused to drink the water because there was the smell of soap in the basin does not appear; but it was a wash basin. It is not shown that the hog was afflicted with disease, or that it died as a result of disease. It would seem that there was no reason why a young, light-weight, healthy hog should not be able to stand a trip of three or four hours. It is more probable—at least the jury could properly have so found—that the hog died from want of reasonable care on the part of defendant. Plaintiff was not required to prove what specific act or acts the defendant and its employees did or failed to do, which brought about that result. The messenger says he noticed the value of the animal in the bill of lading, so that he knew it was a valuable hog.

There may be other circumstances which we have not enumerated. We are not determining the fact questions, but reciting some of the circumstances which made it a case for the jury. It is very clear that, under the entire record, there was a jury question, and that the verdict has sufficient support.

Some of the cases relied upon by appellant are distinguishable in their facts. In one of them there was nothing in the evidence to indicate that the death of a horse might have been attributed to rough handling or to any want of care on the part

of the company, and death from disease or natural cause was conclusively shown to have been more probable. Under such circumstances, it was held that a verdict for the company was properly directed. Such is not the situation in the instant case. Other cases cited and relied upon by appellee are similar to the instant case, where it was held that questions presented were for the jury. Since, as said, the question presented is largely one of fact, we deem it unnecessary to review the cases.

Though the rule as to live stock is somewhat modified, the principle is not to be extended so as to relieve a carrier from the duty to take notice of the ordinary weakness, character, and propensities of domestic animals, and to make such provision against loss or injury therefrom as may reasonably be done, in furnishing the means of transportation and providing for the protection of the property during transit.

As to the duty of the carrier where weather conditions arise during transit, see 4 Ruling Case Law 961. In the instant case, the weather was hot before the hog was delivered to the defendant. Defendant accepted the hog for transportation under such conditions.

2. Appellant complains that the court erred in refusing to give certain instructions asked by the defendant. One of these is to the effect that defendant could not be held guilty of negligence because its employees failed to call a veterinary surgeon, and that it was not required to do so under the facts, and that the jury should find for the defendant as to this claim of negligence. Others are to the effect that defendant could not be held guilty of negligence because of the failure to remove the hog from the crate, or because of failure to remove the hog from the train; and that the jury should find for the defendant as to these claims of negligence. The plaintiff did not plead these matters as negligence, nor did he plead any specific grounds. He contented himself with pleading facts which would make a prima-facie case. The defendant alleged that it was without fault. In *Ruebel Bros. v. American Exp. Co.*, 190 Iowa 600, 610, it was said:

2. CARRIERS: live stock: instructions.

"The jury could find that, the weather being warm, the hog was panting, fretting, and puffing to such an extent as to

attract the attention of the employees of defendant, and to advise them that the condition of the animal was unusual; and yet nothing was done, except to water the animal, which watering was done but three times between Parsons, Kansas, and Dallas, Texas. It could be found that one messenger employed by defendant thought that the animal was probably in danger, and reported that fact to the agent at Dennison, Texas, but that no one wired ahead for someone competent to deal with swine diseases, and that the animal was neither unloaded nor taken out of the crate, which, to all appearances, had become too small to hold it comfortably.''

As before shown, there was evidence in the instant case tending to show that the animal was not properly watered or provided with sufficient air. We are not so sure but that defendant should have done something of the kind indicated in the offered instructions, although these matters were not specifically relied upon by the plaintiff. The court covered the ground by the instructions given as to the duty of the defendant, and we think the court would not have been justified in peremptorily, and as a matter of law, directing the jury to disregard these matters, when considered in connection with all other facts and circumstances in the case. It was for the jury to determine, from all the evidence and proper inferences therefrom, whether defendant failed in its duty.

3. There are some minor matters that we should refer to briefly. It is thought that the court erred in excluding evidence offered by the defendant through its witness Webb, the messenger, as to whether he placed the hogs so that they

3. EVIDENCE: opinion evidence: conclusions of witness.

could get air, and whether the crates were so placed in the car that the hogs could get plenty of air. We think the evidence was properly excluded. It called for a conclusion on the part of the witness. The size of the car, the place where each crate was put with reference to the doors, and that they were away from the wall, were gone into in detail, all the circumstances were shown, and the jury could as well determine as the witness whether they could get plenty of air.

4. The messenger described in detail the actions and conduct of the hog during its transportation, and at one point said

that the hog was evidently trying to break out. This last was a conclusion by the witness, and was properly stricken.

5. It is contended by appellant that the court erred in permitting evidence that the crate in question was in the express office at Iowa City at the time of the trial. The witness who testified that the crate was left at the rendering works in Davenport, and perhaps another witness, testified that they saw the identical crate in the defendant's office at Iowa City at the time of the trial. We think this was proper. The plaintiff could doubtless have compelled its production, had he known of its presence in time. But plaintiff had been completely in the dark from the time the hog was delivered to the defendant until after the death of the hog. He was not present at the postmortem or at the measuring of the crate and of the hog, as testified to on behalf of defendant. Had the crate been produced in court, it could have been demonstrated as to the length of it. It is not very important either way perhaps, and yet there might properly be an inference drawn by the jury. In any event, there would have been no impropriety if either party had produced it in court; and surely, evidence that someone saw it in the depot in Iowa City could work no prejudice.

We shall not stop to consider other matters. We have examined the record, and reach the conclusion that no prejudicial error appears. The judgment is—*Affirmed.*

WEAVER, EVANS, ARTHUR, and FAVILLE, JJ., concur.